IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | NO. 07-0374 |
| NATHANIEL GRIFFIN | : | |

**MEMORANDUM**

STENGEL, J.                                                          July 23, 2009

      Nathaniel Griffin has been charged in a superceding indictment with conspiracy to commit armed bank robbery, armed bank robbery, carrying and using a firearm during a crime of violence, and aiding and abetting. In January 2008, I denied Mr. Griffin's motion to suppress statements and his motion to sever. See United States v. Carter, et al., 2008 U.S. Dist. LEXIS 5458 (E.D. Pa. Jan. 24, 2008). At that time, I found that Mr. Griffin's June 1, 2007 waiver of his right to remain silent was knowing and voluntary, and that his statement would be admissible against him at trial. Id. In light of the Supreme Court's recent decision in Johnnie Corley v. United States, 129 S.Ct. 1558 (April 6, 2009), Mr. Griffin filed a supplemental motion to suppress his statement and all evidence seized from the vehicle he was driving on May 22, 2007. He also filed a motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). For the following reasons, I will deny the motions in their entirety.

      The superceding indictment alleges that on April 19, 2007, Mr. Griffin conspired with others to commit a robbery of the United Savings Bank in Springfield, Delaware County. It is also alleged that Mr. Griffin and his two co-defendants drove together to the

bank with an individual still unknown to law enforcement. The two male defendants and the unknown person forced their way into the bank's vault at gunpoint. Defendant Carter allegedly pointed the gun at bank employees. They stole approximately $53,356 from the vault and the bank tellers' drawers. They fled the bank and got into a car driven by a female co-defendant, and sped away.

At a hearing on the motion, Special Agent Raymond Carr of the Federal Bureau of Investigation testified that an arrest warrant was executed for Mr. Griffin and his two co-defendants. Agent Carr and other local law enforcement officers involved in the case were scheduled to meet at 5:00 a.m., on June 1, 2007, to prepare for the arrest of the three defendants scheduled for 6:00 a.m., that same morning. See N.T. 4/08/09 at 12. Agent Carr testified credibly that the address they had for Mr. Griffin was "somewhat hazy." Id. Accordingly, when the officers received information that Mr. Griffin was at a certain location in Upper Darby on the evening May 31, 2007, they decided to arrest him at 11:00 that night to avoid potential difficulty in finding him the next morning. Id.

The agents took Mr. Griffin immediately to the Lansdowne Police Department to be housed for the night. Id. at 13-14. They handcuffed Mr. Griffin to a chair, advised him that there was a warrant for his arrest for bank robbery, then placed him into a holding cell. Id. at 15-16. Mr. Griffin was not interviewed at that time. Id. at 16. Agent Carr testified that he had been on duty that day from 7:00 a.m., and needed to be back at the Haverford Police Station at 5:00 a.m., on June 1, 2007 for the tactical meeting

regarding the arrest of the co-defendants. Id. It was decided that Mr. Griffin would be housed for the night at the Lansdowne Police Station because of the understandable fatigue of the agent, and so that all three co-defendants could be transported to the FBI offices at Sixth & Arch Streets the following morning. Id. at 30, 43-44. Agent Carr further testified that "from a logistics standpoint it would better serve us to have [Mr. Griffin] closer at hand so that the detectives the next morning would have ready access to him to be able to talk to him." Id. at 39.

Following the tactical meeting at 5:00 a.m., on June 1, 2007, Mr. Griffin's two co-defendants were arrested. Id. at 17. In the meantime, Agent Carr dispatched two police officers to begin interviewing Mr. Griffin at approximately 6:30 a.m. Id. at 19. At approximately 7:30 a.m., Agent Carr told the officers to prepare Mr. Griffin for transport to the FBI office. Id. at 20. All three of the co-defendants arrived at the FBI office at approximately 8:00 a.m., when their interviews with law enforcement officers began. Id. at 21.

Also at the hearing, Detective Bridget McCarthy of the Springfield Township Police Department testified that she and Detective George Christek of the Haverford Township Police Department had been dispatched by Agent Carr to the Lansdowne Police Station to interview Mr. Griffin. They arrived at the station at 6:30 a.m. Id. at 31. She advised Mr. Griffin of his Miranda rights, which he waived and signed a waiver sheet to that effect. Id. at 33. The interview at the station lasted approximately forty-five

minutes and was interrupted because Detective McCarthy was notified by Agent Carr to prepare Mr. Griffin for transport to the FBI office. Id. Once at the FBI office, the interview of Mr. Griffin resumed and lasted another two hours approximately. Id. at 34-35. Mr. Griffin "eventually admitted to being one of the actors involved in the robbery at United Savings Bank." Id. at 37. At 10:30 a.m., Mr. Griffin was processed by the United States Marshal Service, and brought before a United States Magistrate Judge at 1:30 p.m., for his initial appearance.

In his supplemental motion to suppress, Mr. Griffin argues that the delay in his presentment before a magistrate judge was unnecessary and unreasonable because the delay was solely for the purpose of securing a confession. I disagree.

Known simply as the McNabb-Mallory rule, the presentment rule generally renders inadmissible confessions made during periods of detention that violate the prompt presentment requirement of Rule 5(a)[1] of the Federal Rules of Criminal Procedure. See McNabb v. United States, 318 U.S. 332 (1943) (any confessions obtained during unreasonable presentment delay could not be used against a defendant as the basis of a conviction in federal court); Mallory v. United States, 354 U.S. 449 (1957) (the presentment rule does not require mechanical or automatic obedience, but the delay must not be of a nature to give opportunity for the extraction of a confession). The

---

[1] Rule 5(a)(1)(A) provides: A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise.

4

McNabb-Mallory rule continued to be enforced along with Rule 5(a), until Congress enacted 18 U.S.C. § 3501(c), which states in part:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

Here, Mr. Griffin argues that law enforcement officers erred by not beginning the interview closer to the time of his arrest, and that their delay was prompted by the sole purpose of securing a confession.[2] I disagree. Agent Carr provided credible testimony regarding the factors which were considered in making the decision to house Mr. Griffin in Lansdowne for the night. For all practical purposes, the arrest of Mr. Griffin was contemporaneous with the arrests of his co-defendants. The record contains no proof, or

---

[2] I note that had Agent Carr chosen to begin the interview of Mr. Griffin at such a late hour, continued it throughout the night, and obtained a confession, Mr. Griffin could have reasonably sought its suppression based on coercion due to the lack of sleep.

even a suggestion, that the confession was the result of the failure to bring him in for an initial appearance. There was a valid warrant for Mr. Griffin's arrest, his address was "somewhat hazy" prompting the officers to act that night, the law enforcement officers had begun their day at 7:00 that morning, they were understandably fatigued, and they were scheduled to conduct a tactical meeting for the same case early the next morning. Given these circumstances, I find that any delay between Mr. Griffin's arrest and his presentment to a Magistrate Judge was not unreasonable or unnecessary, and accordingly that his voluntary confession is admissible against him at trial.

Mr. Griffin also seeks the suppression of all evidence gathered as a result of the traffic stop and seizure of the blue Buick Park Avenue he was driving on May 22, 2007. At the hearing, Police Officer Eric Michael Girill, of the Upper Providence Police Department, testified that while he was an officer of the Milbourne Borough Police Department, he was involved in a traffic stop at 11:28 a.m., on May 22, 2007. See N.T. 4/08/09 at 46. While patrolling the streets, Officer Girill noticed an unfamiliar blue Buick sedan with four passengers. Id. at 47. He made a U-turn, followed the Buick a short distance, "ran the tag" through the PennDOT computer, and found that the vehicle was improperly registered. Id. At that point, Officer Girill pulled over the Buick and asked to see the driver's identification, registration, and proof of insurance. Id. at 50. The driver, who provided the name "Nathaniel Griffin," informed the officer that he had neither identification nor vehicle information with him. Id. Officer Girill ran the driver's

name and birth date in the computer and found that Mr. Griffin had a "suspended photo ID out of Sharon Hill." Id. Officer Girill then asked if any of the three remaining passengers of the vehicle had a valid driver's license, which none of them did. Id. at 51, 52. Officer Girill called for a tow-truck to impound the vehicle because none of the passengers could legally drive it from the scene, and because the registration of the vehicle was invalid. Id. at 52. Before the vehicle was towed, Officer Girill and back-up officers conducted an inventory search of the car, i.e., the front seats, floor, glove compartment, rear seat, rear floor, and trunk, and recovered nothing. Id. at 53. Officer Girill testified that he observed a "light red, pinkish stain on the driver's side rear seat on the floor." Id. A confidential informant told law enforcement officers who were investigating armed bank robberies in the area that the vehicle used in the robberies was a blue Buick Park Avenue, and that the vehicle had been impounded by the Milbourne Police Department. Agent Carr and other officers went to look at the vehicle and, in plain view, saw the red stains in the car which are consistent with an exploded bank-issued dye pack. With this information, Agent Carr obtained a search warrant for the vehicle and recovered two red dye-stained fifty dollar bills.

Mr. Griffin concedes that once Officer Girill retrieved information on the invalid registration of the vehicle, he had reason to initiate the traffic stop. It is the impounding and subsequent search of the vehicle, however, which Mr. Griffin challenges. Based on his credible testimony, however, Officer Girill had no other reasonable option but to

impound the vehicle. None of the four occupants of the vehicle could legally drive. Accordingly, the officer, of necessity, "seized" the vehicle. Officer Girill had two choices: (1) lock the car on the street and seek a search warrant; or (2) impound the car and seek a search warrant. Impounding the car was the most reasonable option. With the first option, the car could have been removed from the street by the defendant or the car's owner, and any potential evidence removed. The chain of custody of any evidence would also have been compromised. Further, the car was impounded for administrative convenience, i.e., as an alternative to having a police officer "guard" the car for the several hours it might take to obtain the search warrant. The Fourth Amendment protection from unlawful search and seizure was not violated because the vehicle was not searched until a warrant was obtained.

Mr. Griffin seeks a <u>Franks</u> hearing in order to challenge the validity of that search warrant. To obtain a <u>Franks</u> hearing, a defendant must show that: (1) the affidavit in support of the warrant was deliberately false or demonstrated reckless disregard for the truth; and (2) any challenged statement or omission was essential to the magistrate judge's finding of probable cause. <u>Franks</u>, 438 U.S. at 171-72; <u>United States v. Calisto</u>, 838 F.2d. 711, 714-16 (3d Cir. 1988). Mr. Griffin asserts that there were false statements contained in the search warrant affidavit. First, in paragraph eight of the affidavit, the affiant states that the driver of the vehicle produced a driver's license identifying himself as Nathaniel Griffin. Nathaniel Griffin has never had a driver's license. Next, in

8

paragraph fourteen of the affidavit, the affiant states that a confidential informant identified Mr. Griffin from surveillance photos taken during the bank robbery. Mr. Griffin indicates that it is impossible to identify anyone because of the poor quality of the photos. Mr. Griffin argues that setting these statements aside, the warrant lacked probable cause to search the vehicle.

The government concedes that some of the statements in the search warrant affidavit for the Blue Buick Park Avenue are not accurate. However, no evidence has been produced to establish that the inaccurate statements were deliberately false or even that they demonstrated a reckless disregard for the truth. Further, if the inaccurate statements were taken out of the warrant, probable cause would still have existed to search the vehicle. The search warrant was for a four door blue Buick Park Avenue with a vehicle identification number of 1G4CU5217W4637324. A confidential informant, known to law enforcement, identified that vehicle as the one involved in numerous bank robberies. The impounded vehicle was located at the Milbourne police lot. In plain view, through the window of the Buick, law enforcement officers were able to see dye stains in the vehicle which were consistent with dye packs used by banks. Any inaccurate statements that Mr. Griffin produced a valid driver's license or that he was the sole occupant of the vehicle, do not negate the probable cause found by the magistrate judge in approving the application for the search warrant. Accordingly, I will deny the defendant's motions in their entirety. An appropriate Order follows.